## PETER McCAULEY v. JOHN KELLER ET AL.

APPEAL BY DEFENDANTS FROM THE COURT OF COMMON PLEAS OF JEFFERSON COUNTY.

Argued October 7, 1889—Decided November 4, 1889.
[To be reported.]

1. The rule that extrinsic evidence is not admissible to contradict or alter a written instrument, is not infringed by the admission of evidence of a parol agreement whereby, upon a new consideration, a prior contract

Statement of Facts.

under seal between the parties was changed, so as to provide for the doing of something not embraced in the original agreement, or for an alteration in the manner of its performance.

2. In such case, the deviation, except where otherwise expressed or mutually understood, must be taken in its proper connection with the original contract with reference to and in modification of which it was made, and the written contract must be pursued and applied so far as it can be traced in the intention of the parties.

(a) A sub-contract for construction work upon a railroad specified prices for different classes of masonry, and provided that the work should be paid for monthly, as estimated by the engineer in charge. Monthly settlements on the contract were made on the basis of the engineer's estimates, and the work was paid for and receipts taken in accordance therewith.

(b) The highest grade of masonry provided for in the contract was second-class. The sub-contractor brought assumpsit to recover compensation for the work referred to in his contract, alleging that while the work was in progress thereunder the defendants directed him to put in first-class masonry wherever required by the engineer, and agreed to pay him the increased value of such first-class work.

3. The original contract rendered the engineers' estimates, classifying the masonry work, conclusive upon the parties, if made fairly and without fraud, and this stipulation was applicable to all work done under the supplement agreement; wherefore, it was not competent for the plaintiff without attacking the estimates, to go into evidence generally as to how the work done under the supplemental agreement should be classified.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 50 October Term 1889, Sup. Ct.; court below, No. 132 December Term 1888, C. P.

On October 27, 1887, Peter McCauley brought assumpsit against John Keller and L. L. Bush, trading as Keller & Bush, to recover a balance alleged to be due to the plaintiff from the defendants, for work done under contract. The plaintiff declared upon a written contract and also upon a subsequent promise to pay additional compensation for the construction of a better grade of work than that specified in the original contract. The defendants pleaded non-assumpsit, payment, set-off and tender.

At the trial, December 11, 1888, the following facts were shown:

Some time in or prior to 1886, the defendants, Keller & Bush,

took a contract for the construction of the Clearfield & Jefferson railroad from Stephen Green, the general contractor, representing the railroad company, and in the spring of that year they gave to Peter McCauley, the plaintiff, a sub-contract for the masonry on that part of the road lying between Irvona and Mahaffey. The work done by McCauley under this sub-contract was done during the year 1886.

On March 25, 1887, Keller & Bush entered into another contract with McCauley by which they sublet to him the masonry work on that portion of the road between Mahaffey and Williams's Run, which contract was in writing under seal, and was as follows:

Articles of agreement made and concluded this 25th day of March, 1887, between John Keller and L. L. Bush, of Lancaster city, state of Pennsylvania, of the first part, and Peter McCauley, of Philipsburg, Centre county, state of Pennsylvania, of the second part—Agreed, That the said party of the second part will do all the masonry necessary for the completion of the Clearfield & Jefferson railway between Mahaffey and Williams's Run, in a good and workmanlike manner, the same as masonry on same line between Irvona and Mahaffey. Said party of the second part to furnish all labor and material needed to do said masonry; also to do the masonry first where it will be necessary to start grading, or as may be desired by the superintendent of the said Keller & Bush. All work to be done as directed by the chief engineer of said railway. For which the said parties of the first part promise to pay to the said party of the second part the sum of five dollars and fifty cents for all second-class masonry, and two dollars and fifty cents for box-culvert masonry, the same prices to be paid for cubic yards. All work to be paid for as estimated by the engineer in charge during the month, and payments to be made on or about the 20th of the succeeding month, less ten per cent, which shall be kept back until the completion of the work.

PETER McCAULEY. [SEAL.]

Witness,  JOHN KELLER & L. L. BUSH. [SEAL.]

J. A. CARTER.  Per JOHN KELLER. [SEAL.]

The engineer in charge referred to in the contract, was the engineer employed by and supervising the work for the railroad company. The work of construction between Mahaffey and

Statement of Facts.

Williams's Run was done during the season of 1887. For the first month after the work of 1887 was commenced, John D. Riley, assistant engineer, was in charge. The chief engineer, John B. Bott, then took personal charge and supervision. Mc-Cauley commenced the performance of this contract by putting in such masonry as he had constructed in 1886, between Irvona and Mahaffey. When Bott came in charge, however, he refused to accept this grade of work in arch-culvert and bridge masonry, and required such masonry to be constructed in a manner much superior to that of the work of 1886. This requirement was first made in connection with the masonry at Whiskey Run bridge, which was the first arch-culvert work done by McCauley under his second contract. The circumstances in which Bott's directions respecting it were given were thus stated by the plaintiff, testifying on his own behalf:

I met Mr. Bott and Mr. John Keller on the train between Irvona and Mahaffey, I coming from Philipsburg, before we laid any stones to the best of my knowledge on that work at all, but there were some of the stones quarried, and they were quarried like the stones of 1886, fully as good; and Mr. Bott called my attention that he would not accept those stones, the bed was too small and the joints were too small; had not half enough square back to the joint and the face of the stone; and I told Mr. Bott that was not my contract; my contract was to do the work the same as in 1886. Mr. Bott said he didn't know me in the contract at all, anything about my contract with Keller & Bush, but that he was going to have the work done as he saw fit and directed; and then Mr. Keller was in the next seat with him, or probably in the same with Mr. Bott —I don't know, but he was probably in the next seat if not in the same seat—and I told Mr. Keller, and Mr. Keller and Mr. Bott got into a controversy about the matter and I do not know exactly what they said. We then got out at Mahaffey station, and Mr. Keller told me to go on and finish that bridge according to the direction of Mr. Bott, and that he would see the company about it, and if it was required so, to bring the company on the ground, if there was any better work exacted of me than the work of 1886.

Q. What, if anything, did he say with reference to paying you for the work? A. Yes, sir; he said if they exacted any

better work of me than the work of 1886, he would pay me accordingly for it.

Q. What then did you do? A. I finished the bridge; I think it is 133 yards in that bridge; and then we were building a double box culvert.

Q. Let us take that bridge, if you please. How did you build it in comparison with the work of 1886? A. I built it far superior; range work.

Q. In what respect superior? A. Cut stone; we had to cut stone and quarry stone with more care, so as to get each course a certain size throughout.

Q. How about the bridge seats and coping? A. They were neatly dressed to a smooth surface.

The plaintiff further testified: Q. Now, Mr. McCauley, just go on and state how you further proceeded to do the work with reference to what you had done in 1886; what, if anything, Mr. Bott, the engineer, required, and what, if anything, occurred between you and Mr. Keller with reference to the extra work? A. I saw Mr. Bott in the meantime; I could see him nearly every once in a while, probably every day if I wanted to, I think, except on Saturdays and the early part of Monday, that he was with his family; and he told me he would not accept any work like the work of 1886 on his line of road—of bridge masonry; would not have it. Then I went and saw Mr. Keller, and brought Mr. Karbaugh with me.

Q. Just state where you saw Mr. Keller. A. I saw him at the Mahaffey hotel, at Mahaffey station, and told Mr. Keller these facts shortly after the completion of the bridge at Whiskey Run, of which I have already spoken. Then before we commenced the Murray Run arch Mr. Karbaugh and I went to see Mr. Keller at Mahaffey, and I suppose were over an hour, probably two hours, in conversation about this work; and then Keller agreed to give me ten dollars a yard for all arch masonry that was required of me to be cut in the manner in which I cut the stones at Whiskey Run bridge. He said above the spring line he would give me ten dollars for arch masonry. If the work was allowed to be put in the same as the work of 1886, that was not expected. It was all cut stone, ashler, that is the term of the word in railroad bridges. And then Mr. Keller looked after his own rights; he did bring the company there.

Q. Go back to the other conversations, Mr. McCauley, with reference to what you should do other than as in the written contract? A. All the work that I could do, all the work that Mr. Bott would compel me to do of cut stone, cut ashler, that he would pay me first-class for it and sue the company if they didn't pay him.

Q. Did you have any further subsequent conversations with him about the work? A. . . . . I told him that the bench walls were cut ashler, and were required to be put up as the rule of first-class bridge masonry; and John Keller saw it himself that day, and he said it was first-class, as good as there was on the main line. He has stated on several occasions that it was first-class work all throughout the whole entire work of bridge masonry in 1887, and I can prove it that he said so.

Q. Mr. McCauley, come to the conversation? A. Then John Keller told me, "You go on with the entire work; it is no use arguing with the engineers hereafter; I see they are exacting more of us than my contract calls for, and I will pay you first-class bridge masonry for it; whatever is going for such work I will pay you." He paid me some.

The plaintiff testified further that at different times, subsequently, he had conversations with Keller, in which Keller told the witness to go on and complete the work according to the directions of the engineer, and he, Keller, would sue the company for such work as the witness was doing first class, and would pay the witness for the same; that the witness went on and completed the work according to the directions of the chief engineer; that the work thus done by him was superior to that of 1886, and more expensive to build.

On cross-examination, the plaintiff testified: Q. Did you go to work under and by virtue of the agreement in writing, bearing date the 25th day of March, 1887? Did you go to work under that contract and by virtue of what was there stipulated? A. I went to work under that contract, yes, sir. . . . .

Q. Did you work under that contract as made there until the time the work was completed? A. Not under the contract of prices, no, sir.

Q. You did not? A. No, sir, because the contract was changed. . . . .

Q. Now, my friend, I have asked you this question and I

insist on its answer: Did you work under that written contract until the end or completion of this job, or not? A. I done the work under the instructions of the chief engineer.

H. S. Karbaugh, the plaintiff's superintendent, testified that he was present at the interview between the plaintiff and Keller at the Mahaffey hotel; that all three talked together about the work that had been done, and the work the plaintiff was then doing or about to do, namely the Murray Run arch; that the question came up what the plaintiff should be paid for the class of work that was being required of him, and Keller distinctly told the plaintiff he would give ten dollars a yard for all masonry above the spring-line constructed as the Murray Run arch was being constructed; and for the work below the spring-line it was to be the same as in 1886, or second-class work; and if a better grade of work was required he was to get a better rate of pay for it, or what the work was worth.

Q. What was said, if anything, in reference to bridge masonry? A. Well they talked of bridge masonry, but they did not name any price for it, because it was thought at the time that they would continue on and do second-class work; that they would not exact any more first-class work, but if it should be exacted, McCauley was to be paid what that class of work was worth. That was the talk and conversation between Mr. Keller and Mr. McCauley.

James Carroll, sworn for the plaintiff, testified as follows:

Q. What kind of work was done between Mahaffey and Williams's Run, in 1887? A. It was a far better class of work, far superior to it.

Objected to by defendants' counsel.

Q. As a practical mason what class of work would you call the 1887 work? A. Well, what I have seen on other railway branches, I call it first-class bridge masonry.

Defendants' counsel object to that kind of testimony, for the reason that the engineer fixed the grade of work according to the contract, and plaintiff cannot change it by parol.

By the court: The objection is overruled; testimony admitted; exception.[10]

Q. Mr. Carroll, what was the 1887 bridge work, exclusive of the Mahoning Creek pier, worth per cubic yard, the abutments of the bridge?

Objected to by defendants' counsel in that the price is fixed by the contract; and all evidence relative to price, other than what is contained in the contract, is objected to as incompetent and irrelevant and as tending to vary by parol a written contract.

By the court: This is the same objection that has been repeatedly made and does not require additional ruling. The evidence will be admitted; exception.[11]

Q. Mr. Carroll, what was the 1887 bridge work, exclusive of the Mahoning Creek pier, worth per cubic yard, the abutments of the bridge? A. I say nine dollars per cubic yard, the bridge masonry.

Q. What was the arch masonry on the 1887 work worth per cubic yard, the average arch masonry work? A. Ten dollars.

A large amount of other testimony was taken upon the question whether the bridge and arch-culvert masonry constructed by the plaintiff in 1887 should properly be classified as first-class or second-class work, and with reference to its value.

Mr. Keller, testifying for defendants, denied making any agreement with the plaintiff to pay him any additional compensation for his work over and above that specified in the contract of March 25, 1887, except as to the Murray Run arch, which, it was conceded, was by agreement to be paid for at the rate of $10 above the spring-line of the arch. The defendants put in evidence the monthly and final estimates made by the engineer in charge, with reference to the contract between Keller & Bush and Green. In each of these the bridge and arch-culvert masonry constructed by the plaintiff was classified as second-class work. It was admitted, however, by Keller, in his testimony, that the Murray Run arch and a pier in Mahoning creek were not to be included under the head of second-class work. No separate estimates were made by the engineer for the purposes of the contract between Keller & Bush and McCauley, with which contract the engineer had nothing to do, but, on the basis of the estimates made by the engineer, Keller & Bush prepared monthly statements for the purpose of making settlements with McCauley. Each of these statements embraced the whole amount of work done by McCauley under his contract to that time, showed the balance due to date, after

Statement of Facts.

crediting payments previously made, and was accompanied by a receipt from McCauley for the balance so shown. The latest of these statements was as follows, the others being in substantially the same form:

ESTIMATE NO. 6.

September 19th, 1887.

KELLER & BUSH, TO PETER MCCAULEY, DR.

August, 1887.

| | | | |
|---|---|---|---|
| To 2,013 cubic yards second class, at $5.50. | | $11,071 | 50 |
| To 510 cubic yards rectangular masonry, at 2.50, | 1,275 | 00 | |
| To 2,798.2 cubic yards paving, at 2.50, | | 6,995 | 50 |
| To 295 cubic yards arch culvert, at 10.00, | | 2,950 | 00 |
| To 300 cubic yards of stone delivered, | | 600 | 00 |
| | | $22,892 | 00 |
| Less former payments, | | 20,805 | 50 |
| | | $2,086 | 50 |

Received payment, PETER MCCAULEY.

ENDORSEMENT.—Estimate No. 6, for August 1887; $2,086 50.

The final estimate furnished to Keller & Bush by the chief engineer was dated in December, 1887. On the basis of that estimate and of the prices specified in the contract of March 25, 1887, the defendants conceded that there was due to the plaintiff a balance of $2,361.21, including several small items of extra work outside the contract; and the defendants alleged that on January 20, 1888, they tendered the plaintiff $2,406.62, covering the balance aforesaid, with interest thereon and costs to that date, which was refused. A tender of this amount was made in court upon the trial, and refused, and thereupon the sum of $2,406.62 was paid into court in pursuance of it.

The plaintiff testified in rebuttal that at the time of signing the receipts appended to the statements prepared by Keller & Bush he did not know the contents of these statements; that he was never given time to examine them; that he did not understand the figures as placed in the statements, but Keller always told him the receipt was on account, and he would get a final settlement and be fully compensated for the work he was doing; that the witness never received a copy of any of the statements presented to him for signature.

Charge of Court below.

At the conclusion of the testimony, the court, WILSON, P. J., charged the jury in part as follows:

A written contract may be changed by a subsequent verbal agreement to pay an additional sum for the same·work and materials mentioned in the agreement, or as so changed, for better and more expensive work; and in this case, if the jury believe from the evidence that there was a subsequent verbal agreement between the parties, varying the terms of the written agreement, and that the work in question was done in compliance with the latter agreement, it will be binding between the parties. [If the jury believe from the evidence that after making the written contract the parties by parol agreement modified the same as to the quality of material and superior workmanship, so as to make the bridge masonry, arch-culvert masonry, and other work, first-class masonry, instead of second-class masonry, and that the plaintiff performed the contract as so modified, then both parties would be bound by the contract as modified.] [5] [The jury are instructed that, although a written contract while it remains in force and is to be performed, cannot be shown to have been changed by parol agreement, still a written contract may be changed by a subsequent verbal agreement for the performance of additional work or the furnishing of additional materials, or changing second-class masonry to first-class masonry, or for the payment of an additional sum of money; and if the work is subsequently performed and accepted in accordance with the terms of the contract as thus changed, the change will be binding on both parties.] [6]

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

If the jury find from the evidence that the plaintiff rendered services for the defendants as claimed and sued for in this case, at an agreed price, and that he has not been fully paid for the same, then they should render a verdict in favor of the plaintiff for such an amount as the services actually rendered would come to at the stipulated price, less such an amount as the jury believe from the evidence has been paid thereon. [If the jury further believe from the evidence that the plaintiff did the work in question, as claimed in his statement of claim filed in this case, a copy of which has already been presented to you, and there was no special contract as to price, then in coming

at the value of the services the jury should take into account the nature of his employment, the kind of services required of him, and the degree of care, skill and attention bestowed by him, so far as these things have been shown by the evidence, if they do so appear.] [7] And if the jury find for the plaintiff, and if they believe from the evidence that no special price was agreed on, then in arriving at the value of the services, they should consider the means of knowledge of such value possessed by the several witnesses who have testified in relation to such value. Those witnesses who helped to do the work, if any such are shown by the proof, all things being equal, would generally afford better and more reliable evidence of such value than those who speak from theory or general knowledge only, especially if the evidence shows that they never did such work or saw it done, subject, however, to the evidence of the witnesses called who testified that the engineer in charge was better qualified to judge of the work.

The burden of proof as to any payments claimed to have been made by the defendants to the plaintiff is on the defendants; and in case of a conflict of testimony as to such payments, the rule of law is that if the weight of evidence against the payments exceeds or only equals the weight in favor of their having been made, then the jury should consider such payments not proved.

[The court further instructs the jury that a receipt is but prima facie evidence of payment and may be contradicted by parol testimony; and if the jury believe from the evidence that the plaintiff did the extra work for which this suit is brought at the request of the defendants, or either of them, as expressed, and that the plaintiff has not been paid for the same; and further, that the receipts introduced in evidence were not intended to cover these prices, and by mistake of the parties not included in the estimates when the receipts were given, then the jury may find for the plaintiff as to these additional prices.] [8]

If the jury believe from the evidence that on the 20th day of January, 1888, and since the commencement of this suit, the defendants tendered to the plaintiff, in payment of the demands now in question, the sum of $2,406.62, for such debt, interest and costs incurred in the suit up to that time; and further,

that at that time there was no more than said sum of $2,406.62 due to the plaintiff, including such costs, and further, that the defendants kept that tender good by paying the said sum of $2,406.62 into this court for the use of the plaintiff, then upon the question of tender the jury should find a verdict for the defendants. To this it may be added, with such a verdict the plaintiff would be entitled to take out of court the said sum paid in.

\*       \*       \*       \*       \*       \*       \*       \*

The plaintiff's counsel have requested the court to charge the jury:

1. That by the terms of the contract in evidence between the parties, the work to be done by the plaintiff was not required to be of any better quality as to material or workmanship than the work on the line of the same road between Irvona and Mahaffey; and if the jury believe from the evidence that the plaintiff, after he commenced work under the contract, was required by the chief engineer in charge to do the work in a better and more expensive manner than was required by his contract, and he did the work as thus required, at the request of the defendants, or either of them, under their promise to pay therefor, he is entitled to recover for such extra work and expense what they are reasonably worth, where no specific price was agreed upon between the parties for such extra work.

Answer: Affirmed.[1]

The defendants' counsel request the court to exclude from the consideration of the jury the evidence of Peter McCauley given in relation to the receipts on exhibits from 1 to 6 inclusive, on the ground that it is insufficient to invalidate such receipts.

Answer: Refused.

The defendants further request the court to instruct the jury:

1. The parties, without fraud or mistake, having put their engagements in writing, such writing is not only the best, but the sole evidence of the agreement.

Answer: Affirmed.

2. To establish a change in the written contract, the plaintiff must prove such change in the terms thereof, by testimony that is clear, precise, explicit and indubitable.

Answer: Affirmed.

3. By the terms of the contract, the engineer was made the judge of the class, as well as the character of the work; and he, having without fraud passed upon the class and character of the work, the plaintiff is bound thereby, and cannot be permitted, under the terms of the contract, to claim additional compensation, because the work was done better than other work of the same class.

Answer: Affirmed. This point omits any reference to any change in the contract as stated in the plaintiff's first point.[2]

4. That, if the monthly estimates of the work were made out according to the terms of the written contract, (except as to the work done above the spring-line in what is known as the Murray's Run arch,) and the plaintiff received and receipted for the price, as therein fixed, he cannot avail himself of any alleged parol change of price different from that contained in the written agreement.

Answer: Refused.[3]

What then are the important questions in this case to be determined by the jury from a preponderance of the evidence? First, the sealed contract of March, 1887, is undisputed. Second, the plaintiff claims that this contract after it was made was changed, whereby he was to make the masonry first class instead of second class, and receive a corresponding increase of price, and that he made it first class. Third, the defendants say there was no such change in the contract as alleged, but that the contract executed between the parties in March was the only contract ever made, except that the plaintiff was to be paid extra for the Murray Run culvert, and that it was included in the estimates furnished by the chief engineer, paid by the defendants to the plaintiff, and that all work was paid for according to the March agreement and the estimates, except that the final estimate was not received until after suit was brought, and then the balance due, with interest and costs, was tendered to the plaintiff and refused by him; and further, that the work here claimed for was second-class masonry, as specified in the written contract. If the jury find from the evidence that there was a change in the contract as claimed by plaintiff, then you will consider the value of the work as established by the testimony; but if you find from the evidence

Arguments.

that there was no change in the contract, (and to establish that the testimony must be clear, precise, explicit and indubitable,) then your verdict ought to be for the amount undisputed; and if you return a verdict under the pleadings in this case as claimed by the defendants, then according to the pleadings, the plaintiff would be entitled to take out of court, in addition to the verdict, the sum paid in, $2,406.62; or, you may return a special verdict, fixing the value of the extra work, if any, and the court will mould it in proper legal form.

The jury returned a verdict in favor of the plaintiff for $11,839.45, in addition to the sum paid into court. A motion for a new trial was refused, without opinion filed, and judgment was entered on the verdict. Thereupon the defendants took this appeal, assigning for error, inter alia:

1. The answer to plaintiff's point.[1]
2, 3. The answers to defendants' points.[2] [3]
5–8. The parts of the charge embraced in [ ] [5 to 8]
10, 11. The admission of the plaintiff's offers.[10] [11]

*Mr. George A. Jenks* (with him *Mr. G. D. Jenks, Mr. W. P. Jenks* and *Mr. E. H. Clark*), for the appellants:

1. There being no allegation of fraud or mistake in the esti-mates made by the engineer in charge of the work, those estimates were final. The written contract between the parties contemplated that all masonry on the line between Mahaffey and Williams's Run should be either second-class masonry or box-culvert masonry, and fixed the prices for those two classes. It provided that all work should be done as directed by the chief engineer, and paid for as estimated by the engineer in charge. This last clause is a usual one in such contracts. Its propriety as a means of avoiding litigation respecting measurements and classification, is well illustrated by the uncertain and conflicting testimony in this case. The estimates here were made by the proper engineer. They classified all the plaintiff's work, except the Murray's Run arch, as second-class masonry. This classification was final under the contract: Monongahela Nav. Co. v. Fenlon, 4 W. & S. 205; N. L. R. Co. v. McGrann, 33 Pa. 530; Faunce v. Burke, 16 Pa. 469.

2. There was no change in this clause of the contract. Tak-

ing the testimony for the plaintiff as fully true, a change in price, if first-class work should be exacted by the engineer, is substantially all that is shown by it. The finality of the engineer's estimates, both as to the amount and class, was left unchanged. When a written contract is acted under, and estimates made and receipted according to its terms, it requires clear and explicit proof to justify a submission to a jury of the question whether it has been so changed as to waive all its terms, and permit a recovery upon a quantum meruit: McGrann v. Railroad Co., 29 Pa. 82; Shaw v. Turnpike Co., 3 P. & W. 445; and where a deviation from the contract is established, the special contract thus changed must be pursued so far as it can be traced and made to apply: Merrill v. Railroad Co., 16 Wend. 586 (30 Am. Dec. 130); Dubois v. Canal Co., 4 Wend. 285. The court allowed the plaintiff to give evidence as to the whole value of the masonry as upon a quantum meruit, notwithstanding that his statement of claim was drawn in affirmance of the contract.

*Mr. B. J. Reid* (with him *Mr. R. C. Winslow, Mr. J. E. Calderwood* and *Mr. Charles Corbet*), for the appellee:

1. The main question in the cause is whether a written contract can be modified, or a new agreement substituted for it, by parol, and whether there was sufficient evidence of such parol change to go to the jury. Parties may by parol waive, dissolve, annul, subtract from, vary or qualify their written contracts, and make new agreements, and are bound thereby: Malone v. Dougherty, 79 Pa. 46; Emerson v. Slater, 63 U. S. 28; Munroe v. Perkins, 9 Pick. 298; Wilgus v. Whitehead, 89 Pa. 131. To establish such a parol agreement a mere preponderance of evidence is sufficient. There was abundant evidence to submit to the jury on this question and to justify their verdict, and the finding of the jury is conclusive in this court: Bartlett v. Kingan, 19 Pa. 341.

2. We dispute the assumption of the defendants that the written contract made the engineer the judge of the class of the work. The words, " all work to be paid for as estimated by the engineer," have reference simply to an estimate of the quantity of the work done, made each month, as the work progressed, in order to adjust the amount of the monthly

Opinion of the Court.

payments. There is nothing to indicate that the estimates were to be taken as final, even on the quantity of work done, when it was completed. Had the parties intended that the engineer should determine the class of the masonry, they would have used apt words for the purpose. But the subsequent agreement to pay value for the work as enhanced by additional labor, cost and expense, would abrogate any provision in the original contract for a classification by the engineer, if such there was in it.

3. Whether the written contract had been changed, the scope and extent of the new agreement, and the kind, class, character and value of the work done under it, were all questions for the jury, and any testimony giving light on any of them was admissible. The plaintiff was not claiming on a quantum meruit for all the work done by him. He claimed under the written contract for the work done under it before any change was made, and under the subsequent parol agreement for extra compensation, for extra and more expensive work than the written contract required. If the jury found that no specific price was fixed for a portion of the extra work, the instructions of the court as to the mode of arriving at its value cannot be questioned.

4. The plaintiff's receipts, appended to the so called estimates made out by Keller & Bush, are not conclusive on him as to the correctness of the classification or as to the amounts due him. In a long line of cases, commencing with Hamilton v. McGuire, 3 S. & R. 355, it has been settled that a receipt is mere matter in pais which estops nobody. It is like any other parol admission by the party, open to contradiction, explanation or correction: Russell v. Church, 65 Pa. 15. It is erroneous to assume, as the defendants' third point did, that the engineer had in fact, without fraud, passed upon the class of the plaintiff's work. Whether he had or not, was a question of fact, depending upon evidence, and therefore for the jury and not for the court.

OPINION, MR. JUSTICE CLARK:

It is very plain that the parties to this contract had in contemplation that no part of the masonry between Mahaffey and Williams's Run would be first class. It was to be the same as

the masonry between Irvona and Mahaffey, which had been constructed in the previous year, and was considered second class. The contract, in specifying the prices to be paid, made no provision for any first-class work. It is equally clear that the work was to be done "as directed by the chief engineer" of the company, and that "the work was to be paid as estimated by the engineer in charge during the month, payments to be made according to that estimate about the 20th of the succeeding month, less ten per cent," etc. Under the written contract, therefore, the engineer was the arbiter of the kind of work to be done, as well as of the class to which it belonged, and his decision determined the compensation which the plaintiff was entitled to receive under his contract. It turned out, however, that at certain points on the line masonry of a higher class and grade was required by the engineer than was contemplated by the parties, and the contract fixed no price for this higher grade of work. It is alleged on the part of the plaintiff that when this exigency arose the defendants instructed the plaintiff that the work should be done "as directed by the engineer," and that they would pay the plaintiff what it was reasonably worth; that the work required for arch masonry was of a superior quality and workmanship, and that the whole work as completed under the requirements of the engineer was of a better quality than that between Irvona and Mahaffey, which was mentioned in the contract as descriptive, in a general way, of the kind of work to be done; and this suit is brought, not only to recover for "extra" work, that is to say, for what the work done was worth more than was stipulated in the contract, but also for the balance remaining upon the work done under the special contract.

It was undoubtedly competent for the plaintiff, by parol, to show a new and distinct agreement subsequent to the contract under seal, whereby, upon a new consideration, the original agreement was changed and the plaintiffs agreed to perform additional work, or the same work in a different manner. The rule that extrinsic evidence is not admissible to contradict or alter the written instrument is not thereby infringed: 1 Greenl. Ev., § 303; Malone v. Dougherty, 79 Pa. 53; Collins v. Barnes, 83 Pa. 15. But, in such cases, the special contract will be pursued as far as it can be traced in the intention of the parties.

The deviation, except where otherwise expressed or mutually understood, must be taken in its proper connection with the original contract, with reference to and in modification of which it was made. The theory of the plaintiff's case is that, according to the doctrine established in Vicary v. Moore, 2 W. 457; Spangler v. Springer, 22 Pa. 454, and other cases, to which it is unnecessary to refer, the parol agreement drew or retained the stipulations of the sealed instrument in parol, and turned the plaintiff over to his action of assumpsit for the balance due upon the entire work; that the provisions of both contracts thus became one entire parol agreement, and it is upon this ground, as we understand the case, that the plaintiff bases his right to recover his whole claim in this form of action. It is plain, then, that the sealed instrument must be supposed to contain the agreement of the parties to the full extent that it has not been modified by the subsequent parol contract, and that both taken together (the former being subject to the latter) state the agreement of the parties. If there had been no provision for estimates, etc., the plaintiff would, without doubt, have been entitled to recover upon a quantum meruit whatever he could show the work was worth; but all the work was to be done as directed by the engineer, and was to be paid for as estimated by the engineer in charge during the month.

The work covered by the parol agreement was the same work which was embraced in the special contract. It is alleged simply that it was to be performed in a different way if the engineer required it to be so done, and if the estimate of the engineer was not to determine its nature and extent it would doubtless have been so stated. The masonry was to be the same as masonry on the same line between Irvona and Mahaffey, but it was to be paid for as estimated by the engineer in charge during the month. If the work, under the requirements of the engineer, was of a higher class, it was for the engineer to determine and designate the class of work to which it belonged, according to the usual and customary methods in railroad construction. It is not to be supposed the parties intended that the engineer, in making his estimates from time to time, was to compare in detail the work of 1887 with that of 1886, and that the compensation was to be rated accordingly. The contract provides the price to be paid for second-class work, the nature

and characteristics of which were presumably known to the engineer; and this of itself indicates that the work was to be estimated according to a certain classification recognized in the business, and was to be compensated accordingly. Upon that basis of calculation the defendant would be held for the difference between the value of the work required and the sum stipulated in the contract. If the parties fixed any price for the work which was required to be done in a superior manner, that price would govern in the calculation of the amount; if not, the value of this class of work could be otherwise readily shown. But the kind and classification of work was for the engineer, and his estimates, monthly and final, were conclusive upon both parties.

Although the character of the work to be performed is described, in a general way, as the same as the masonry between Irvona and Mahaffey, yet it was to be done " as directed by the engineer of the company," and in a good and workmanlike manner. Although, as between the contracting parties themselves, the work would be satisfactory if it was the same as the masonry between Irvona and Mahaffey, yet it was required to be done as directed by the engineer. McCauley entered into this contract with notice of the duties and powers of the company's engineer. He took his chances with the engineer, and was to receive pay as for second-class work. It is conceded that the masonry between Irvona and Mahaffey was second-class work of an inferior quality; but this work, although of the same class, was to be performed in a good and workmanlike manner, as directed by the engineer. First-class work was not contemplated, but, when work of that class was afterwards required, the parties appear to have provided for it in a subsequent parol agreement. How much of this first-class work the engineer directed to be done, and how much was actually performed in pursuance of his direction, was for the engineer to estimate; and his certificate, fairly made, without fraud, was, by the terms of the contract, binding upon the parties. We are of opinion, therefore, that the court erred in throwing this inquiry open to the opinion and estimate of those who casually observed the work, the parties having designated a person for this purpose, a person whose classification of the work and measurement of the amount were necessarily binding in the computation

of the plaintiff's claim. That the parties so understood their contract is shown by the fact that monthly settlements were made upon the estimate of the engineer, and the work was paid for and receipts taken in accordance therewith. The estimates, it is true, were in some instances modified and changed, but the classification and measurement of the engineer constituted the general basis upon which these settlements were made.

It is unnecessary, we think, to consider the assignments of error in detail. If we are right in what we have said, the case was tried under a mistaken view of the nature and obligations of the contract. If, at the re-trial, the cause is conducted upon the theory suggested in this connection, the other matters assigned for error cannot arise.

> The judgment is reversed, and venire facias de-novo awarded.